## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Anthony Schmitt, | Court File No. 0:24-CV-00034 |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJUNCTION** |
| Jolene Rebertus, in her official capacity as Assistant Commissioner of the Minnesota Department of Corrections; Paul Schnell, in his official capacity as Commissioner of the Minnesota Department of Corrections, | |
| Defendants. | |

## INTRODUCTION

Plaintiff Anthony Schmitt is a Christian called by God to minister to men in prison. Acting upon his calling, from 2012 to 2023, Schmitt taught "The Quest for Authentic Manhood" ("Quest") class at the Minnesota Correctional Facility – St. Cloud (the "MCF"). Quest is designed to teach men how to live lives of "authentic manhood" as modeled by Jesus Christ and directed by the Word of God. By doing so, Quest also facilitates successful transitions to the community for male prison inmates. This class always was and will be completely voluntary for inmates to attend.

1

And, as those who attended it testify, the program worked. Schmitt and his colleagues taught the class to more than a thousand inmates at MCF over more than a decade, and it has been highly successful in helping rehabilitate inmates and helping them transition them back to the community. Schmitt held graduation ceremonies for those completing the course, where inmates shared their thoughts on the program. At these ceremonies, tears were shed, inmates reported that families had been restored, resentments had been healed, sons had told their fathers they loved them and were proud of them, and fathers had told their sons the same. For some, this was the first time these words were spoken in their lives.

Despite Quest's success, Schmitt has been forbidden from teaching the Quest program at MCF-St. Cloud since July 2023. Why? Expressly because of the religious beliefs Schmitt expresses in the program. On July 10, 2023, Defendant Jolene Rebertus sent Schmitt a letter informing him that he would no longer be allowed to teach Quest. The letter stated, most relevantly:

> The program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, ***through a biblical lens*** of what a "real man looks like."

Schmitt Decl. ¶ 47, Ex. B at 3 (emphasis added).

Incredibly, Defendant Rebertus admitted in this letter that the Defendants are openly discriminating against Schmitt because of the ***biblical*** basis for his

religious beliefs. *See id.* This violated and continues to violate Schmitt's constitutional rights.

Defendants' actions have irreparably harmed Schmitt because he is forbidden from teaching the class to inmates at the MCF. Absent an injunction[1] requiring Defendants to allow Schmitt to teach the class, he will continue to experience harm that only this Court's action can fix. And if Schmitt is allowed to resume teaching Quest, he will.

Defendants clearly cancelled the Quest class because of Schmitt's religious beliefs, meaning that their decision is subject to the strictest scrutiny under the law. *See Fulton v. City of Phila.*, 141 S. Ct. 1868 (2021). *Fulton* controls here, and strict scrutiny applies to Defendants' actions. Plaintiff will thus easily demonstrate a "fair likelihood of success on the merits" of the case. And Defendants cannot demonstrate *any* harm to any interests they claim by reinstating the class because it is entirely voluntary, even if wildly popular.

Schmitt should not have to wait years for the final resolution of this case before the Quest program is reinstated. He therefore asks this Court to issue a preliminary injunction requiring reinstatement now pending the final outcome of this case.

---

[1] Defendants' counsel indicated in a meet-and-confer conversation on February 8, 2024, that Defendants would not agree to reinstate the Quest program, necessitating this motion.

## RELEVANT FACTS

### I.   Tony Schmitt's religious beliefs.

Schmitt is a Christian. He believes that the Bible is the inerrant Word of God and provides guidance for all essential doctrine, knowledge, and instruction for daily living. *2 Timothy 3:16–17*; Compl. ¶ 25; Schmitt Decl. ¶ 2. Consistent with the Bible, Schmitt believes that, in creating human beings as both male and female, God created them as uniquely distinct and, therefore, their innate differences are not an artificial construct of culture but rather distinctions created by God as part of the created order of the universe. *Genesis 1:26–27*; Compl. ¶¶ 26, 29; Schmitt Decl. ¶¶ 3, 6. Schmitt also believes that all men and women have equal dignity in the eyes of God, because they are created in the very image of God. Compl. ¶ 30; Schmitt Decl. ¶ 7.

Based on their God-created distinctions, Schmitt believes that men and women occupy distinctly different roles in family and society. Compl. ¶ 27; Schmitt Decl. ¶ 4. Schmitt believes that in the marriage relationship, the man has a biblical command to love and care for his wife and family as head of the household just as Christ is the head of the Church. *1 Corinthians 11:3*; *Galatians 5*; Compl. ¶ 28; Schmitt Decl. ¶ 5. As a result, the male leadership role is critically important for a healthy marital relationship, as it sets the tone for and fosters mutual respect between men and women: men are called to submit to and love their wives, and women are called to submit to and love

4

their husbands. The Bible commands mutual respect toward one another, and even calls men to the high standard of understanding, honoring, and valuing their wives. *1 Corinthians 11:3*; *Galatians 5*; Compl. ¶ 28; Schmitt Decl. ¶ 5.

Schmitt also believes he has a calling to minister to men in prison, a calling repeatedly encouraged throughout the Bible, including expressly by Jesus Christ. *Psalm 146*; *Matthew 25:36–40*; *Hebrews 13:1–3*; Compl. ¶ 31; Schmitt Decl. ¶ 8. It is Schmitt's sincere belief that many men commit crimes because they lack a relationship with God through Jesus Christ and grew up in households with abusive or absent fathers, where they were subject to abuse and neglect that led to criminal behavior. Compl. ¶ 32; Schmitt Decl. ¶ 9. Through repentance and rehabilitation, Schmitt believes any person can live physically, spiritually, emotionally, and mentally healthy lives through the healing power of Christ. Compl. ¶ 33; Schmitt Decl. ¶ 10. The healing power of Christ, Schmitt believes, enables successful assimilation back into the community, leading to a stable, productive, God-honoring life that is beneficial to both the individual and the community. Compl. ¶ 33; Schmitt Decl. ¶ 10.

## II.    The Quest program and its success at MCF.

The Quest program teaches the long-established, orthodox Christian principle, based in the Bible, that men and women have distinct, complementary roles of equal value to God, themselves, and society. Compl. ¶ 35; Schmitt Decl. ¶ 12. Quest is based entirely on biblical principles and is

expressly designed to teach and communicate what the Bible teaches. Compl.

¶ 37; Schmitt. Decl. ¶ 15. Quest was created and narrated by Dr. Robert Lewis,

through the organization "Authentic Manhood." Compl. ¶ 38; Schmitt Decl.

¶ 16. It states its purpose as follows:

> Authentic Manhood is all about setting men up to live lives of
> truth, passion and purpose. Our resources offer clear and practical
> Biblical insights on God's design for manhood that are both
> refreshing and inspiring. We point men to a gospel-centered vision
> of life that sets them up to enjoy God's grace as they pursue the
> promises of His Word. Our resources, including the original Men's
> Fraternity curriculum created by Dr. Robert Lewis, have
> influenced millions of men around the world.

Compl. ¶ 38; Schmitt Decl. ¶ 16.

The Quest program has 24 DVD videos, and each class involves a 45-minute

video "session" followed by discussion, for a total of about one hour. Compl.

¶ 36; Schmitt Decl. ¶ 13. Each video covers very difficult issues in relationships

with fathers, mothers, wives, and girlfriends that many men, including those

at MCF, have encountered. Compl. ¶ 39; Schmitt Decl. ¶ 17. Quest works by

providing Biblical principles to address these wounds and helps participants

overcome the difficulties and challenges these wounds have created through a

relationship with Jesus Christ as Lord and Savior. Compl. ¶ 40; Schmitt Decl.

¶ 18. According to Schmitt's understanding, in addition to MCF, Quest has

been presented (and still is presented) at churches and in prisons across the

United States. Compl. ¶ 41; Schmitt Decl. ¶ 19.

Motivated by his beliefs and calling, in about 2012 Schmitt approached Bill Dornbush, then the Chaplain at MCF, and inquired about volunteering at MCF to facilitate the Quest program. Compl. ¶ 34; Schmitt Decl. ¶ 11. They agreed it would be a good program for the men incarcerated at MCF. Compl. ¶ 42; Schmitt Decl. ¶ 20; Dornbush Decl. ¶ 4. Since it was implemented at MCF, Quest was a voluntary program, and, if offered again, it always will be. Compl. ¶ 43; Schmitt Decl. ¶ 21; Dornbush Decl. ¶ 7. Schmitt never has and would not request that the program be mandatory in any way. Compl. ¶ 43; Schmitt Decl. ¶ 21.

From 2012 through the interruption created by COVID-19 and the government response to it, Schmitt and Robinson taught Quest at MCF in two sessions each week. Compl. ¶ 44; Schmitt Decl. ¶ 22. During each session, a video would be presented, followed by questions and discussion. Compl. ¶ 44; Schmitt Decl. ¶ 22. MCF advertised Quest in each of the housing units of the prison and the men voluntarily signed up by contacting Dornbush, with the understanding this would be a commitment for 12 weeks with meetings twice a week. Compl. ¶ 45; Schmitt Decl. ¶ 26; Dornbush Decl. ¶ 7. For many men, this was a big commitment. Dornbush Decl. ¶ 7. The program quickly became a success. Compl. ¶ 44; Schmitt Decl. ¶ 24; Dornbush Decl. ¶ 6.

As the first 12-week class of Quest came to an end, inmates excitedly approached Dornbush asking if they could take the course again. Schmitt and

Dornbush asked those wanting to repeat the course to help facilitate discussion in a small group of five to seven inmates. These small-group discussions developed great relationship building and provided a lot of opportunity for men to encourage each other in a positive way in the prison environment. Compl. ¶¶ 46–47; Schmitt Decl. ¶¶ 27–28; Dornbush Decl. ¶ 8.

Advertising in the living units was no longer required for the Quest course. Instead, the men who had graduated would advertise it by sharing with other men what they were learning and how it was affecting their own lives in a very positive way. This word-of-mouth advertising resulted in having a full list of men signed up for the next class even before the existing class was complete. From that time on, every new Quest class was full to the chapel's 49-person capacity. Compl. ¶¶ 48–50; Schmitt Decl. ¶¶ 29–31; Dornbush Decl. ¶¶ 10–11.

By the end of each program, because inmates at MCF are often transferred, there were usually 25-35 men who graduated. Schmitt and his colleague Bruce Robinson would present 17 videos from Quest instead of all 24 to ensure that as many men as possible could graduate. They chose the 17 best videos from the Quest program, based on how important the material was, in consideration of their religious beliefs. Compl. ¶¶ 50–51; Schmitt Decl. ¶¶ 31–32.

Quest became the most popular religious program out of MCF's approximately 45 other programs run in the chapel. Dornbush considered the "Quest for Authentic Manhood" program MCF's premier religious program,

8

graduating over 900 men during his tenure. Compl. ¶ 52; Schmitt Decl. ¶ 33; Dornbush Decl. ¶¶ 12, 14.

Over the years running this program, Dornbush and Schmitt had many incarcerated men tell them how important "Quest for Authentic Manhood" was in their life, and how it changed their thinking and gave them practical tools for their future. The Quest program was so successful, and the testimonies of the participants so powerful, that Chaplain Dornbush decided that cake and coffee would be served at each graduation ceremony. Compl. ¶¶ 52, 56; Schmitt Decl. ¶¶ 34, 37–38; Dornbush Decl. ¶ 15.

### III.   The 2018 review of the Quest program.

During this time, in July 2018, Charles 'Pete' Sutter, Statewide Recidivism Re-duction Project Supervisor, reviewed the Quest program. Sutter's findings were mostly positive, including:

- **Program staff exhibited strong prosocial values.** Quest group facilitators are passionate, knowledgeable and believe in offender change. Programs whose staff are selected for their strong support of offender change, empathy and fairness see better outcomes with regard to recidivism reduction. It was clear from my observation that Tony and Bruce exhibited all of these traits, had a very non-confrontational style and cared about the men they served.

- **The program is supported by institutional administration at MCF-St. Cloud.** Programs supported by institutional administration have participants that are more successful upon release. The group receives regular referrals, high praise from stakeholders, and there was no indication of dissatisfaction with the program from institutional staff.

9

- **The Quest program addresses appropriate targets.** Programs effective at reducing recidivism and changing offender behavior focus on criminogenic needs. Criminogenic needs are the thoughts, behaviors and environmental factors that produce crime and include; anti-social attitudes, values, and beliefs, anti-social peers, substance abuse, employability, education and familial influence. Through a cursory review of Quest's programming, it appeared that it was addressing several criminogenic factors; including modules that focused on changing pro criminal attitudes, anger and hostility, promoting family affection, problem solving skills, and increasing self-control.

- **Length of treatment.** The Quest program is designed to be completed in 26 weeks, or about 6 months. The literature on evidence based practices states that programming should last between 3 and 9 months and not to exceed a year for most offenders.

- **The group caters to different learning styles.** Quest uses a variety of approaches that respond well to various learning styles. The use of videos, discussion and workbooks allows men with different learning styles to take in the material in ways that work best individually. This goes a long way in building an optimal learning environment and adheres to principals regarding specific responsivity.

The department's findings also included some perceived negatives, including that the program did not exclude anyone unless it was full, that recidivism risk levels were mixed (that there were not separate groups for high-risk versus low-risk inmates), and that lecture-and-process group activities are not necessarily as effective as other approaches in reducing recidivism. Sutter also included one final finding, that the "Remembering Dad" video session

discussed, among other things, the injuries caused by growing up in a household with an absent father. Of those injuries, sexual

orientation was mentioned and described homosexuality as an injury. This view is not supported by research is offensive and close to running afoul of Minnesota's Human Rights Act. [sic] It should be noted that, [sic] some jurisdictions are now stating that treatment that addresses homosexuality as a treatable character defect are psychologically damaging and illegal. You should remove this from Quest's programming.

Compl. ¶¶ 58–60; Schmitt Decl. ¶ 39, Ex. A at 1–3.

A portion of the view expressed in the "Remembering Dad" session is consistent with Schmitt's religious belief that homosexual acts are sinful (*Leviticus 20:13; Romans 1:27*), not solely driven by innate sexual orientation (*James 1:13–15*), and cause separation between people and God, as all sin does (*Romans 3:23*), but can be avoided through repentance. Despite Schmitt's agreement with the Quest program that homosexual acts are sinful according to the Bible, Schmitt decided to fast-forward through that one small segment of the "Remembering Dad" session going forward, to avoid conflict and continue to present the remainder of Quest without edit. Compl. ¶¶ 61–62; Schmitt Decl. ¶¶ 40–41.

After Sutter's review, Quest continued for about two years without negative incident. Even better, the program continued to be successful: many more inmates graduated and had a positive experience.[2] A few months before

---

[2] Dennis Angell is one such individual who had a positive experience. The Quest program changed his life and, now living and working in New Ulm, Minnesota with his wife, he is forever grateful to have been a part of Quest. Angell Decl. ¶¶ 1–3, 21. Angell is especially grateful to the volunteers running

COVID-19 emerged, Schmitt was able to get a portable baptistry to MCF for the participants in the Quest program, and Schmitt and his colleagues were able to meet 44 inmates' requests to be baptized because they had found faith in Jesus. Compl. ¶¶ 63–64; Schmitt Decl. ¶¶ 42–43.

On March 17, 2020, MCF shut down all religious programming, including Quest, as part of its and the State's response to the emergence of COVID-19. It was not until 2023 that religious programing at MCF could resume. Compl. ¶¶ 65–66; Schmitt Decl. ¶ 44–45; Dornbush Decl. ¶ 13.

After resuming, because of the difficulties created by COVID-19 and the government's response to it, Schmitt selected the 11 videos from the Quest program which Schmitt believed were best equipped to help the inmates, including videos that help them find salvation through a personal relationship with Jesus Christ as Lord and Savior. This was designed to ensure the inmates get through the most essential materials in the Quest program. Despite these challenges, Quest continued to achieve the same positive results. Compl. ¶¶ 66–67; Schmitt Decl. ¶¶ 45–46.

---

the Quest program, who were always welcoming, encouraging, and provided a living witness of how the Quest program can change a life. *Id.* ¶ 19–20.

**IV.   MCF abruptly shuts down Quest because of Schmitt's religious beliefs expressed through Quest.**

On July 10, 2023, Defendants abruptly shut down Quest. As Defendant Rebertus' email to Schmitt shows, this decision was made because Defendants concluded that Quests' religious beliefs related to manhood and sexuality were contrary to the DOC's "diversity, equity, and inclusivity values." The email states, in full:

> After review of The Quest for Authentic Manhood curriculum, the decision has been made to discontinue offering this program at MCF- St. Cloud to incarcerated individuals.
>
> The program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, through a biblical lens of what a "real man looks like". Throughout all sessions reviewed, men were only identified as heterosexual, seeking ideal relationships and marriage with women. It is evident that throughout this curriculum, manhood can only be achieved through heterosexual relationships.
>
> Additionally, throughout many of the sessions, women are also identified as the problem for creating "soft males", described as indecisive and weak. Women are described as having fragile frames and not physically as strong. Mothers are described as ignorant, suffocating, needy, and unwilling to release control of their sons. The ideal marriage core role for the wife is described as the "helper" and husband as the "head". Women are described as submissive in this role, keeping his leadership in her view, not competing with him, and to wait for him to take charge. While the teachings do describe the woman in this role as "honorable", the reinforced stereotypes and biases can be hurtful and downright dangerous for those participants who either committed acts of violence, domestic violence, or may be victims of violence by women.

Our population should be able to explore their identity with professionals who root practice and teachings safely in trauma informed science and research. The complete disregard for identifying anyone as a "successful man" who doesn't fit the picture outlined in these sessions completely defies our mission of a person-centered approach to transforming lives.

Religious services are provided in our prisons as an ongoing opportunity to explore and practice teachings and traditions of an individual's choosing. However, just because a program identifies as a religious program does not mean the DOC must provide it. Quest teaches participants about manhood through a lens of discrimination, exclusivity, gender biases and stereotypes that not only contradict the DOC's mission of providing transformational programming, but can be hurtful to participants, their families, and victims.

Jolene Rebertus, MA, LPCC, LICSW
Assistant Commissioner, Health, Recovery, & Programming

Compl. ¶¶ 5–6, 69; Schmitt Decl. ¶ 47, Ex. B at 3.

After receiving this email, Schmitt asked Rebertus to reconsider, and Rebertus refused. Compl. ¶ 70; Schmitt Decl. ¶ 50, Ex. C, at 3. To date the ban remains: Quest does not operate in MCF because Defendants stopped it from operating. Compl. ¶ 71; Schmitt Decl. ¶ 51. If allowed to operate again, Schmitt would resume Quest's programming in MCF. Compl. ¶ 71; Schmitt Decl. ¶ 51.

## V.   MCF intentionally discriminates against Bible-based, traditional, orthodox Christian views of sexuality and the roles of men and women in family and society.

Defendants allow other religious and secular programs which do not include Quest and Schmitt's specific religious beliefs, including other Christian programs to operate at MCF. Compl. ¶ 73; Schmitt Decl. ¶ 53. In August 2023,

right after Quest was canceled, these programs included "the old Norse paganism Ásatrú," "Catholic Mass," "Jumuah Prayer" for the Islamic faith, "Native Sweatlodge," and "Rock of Ages" for Seventh Day Adventists. Dornbush Decl. ¶ 17, Ex. A at 1.

It is therefore evident that Defendants have created and enforced against Schmitt a written policy or unwritten custom or practice which limits religious programming to only those programs which agree with the DOC's views of human sexuality and the roles of men and women in society, and intentionally excludes programming which includes Schmitt and Quest's Bible-based, orthodox Christian beliefs. Compl. ¶ 74; Schmitt Decl. ¶¶ 57–59.

Schmitt's beliefs, and those presented in Quest, are consistent with orthodox and traditional Christian views of human sexuality and the roles of men and women in society. Compl. ¶ 75; Schmitt Decl. ¶ 54. They are exemplified by, for example, the Confessional Statement of The Gospel Coalition, a fellowship of Reformed evangelical Christian churches which emphasizes historic Christian beliefs and practices. Similarly, they are exemplified by the 2017 Nashville Statement, whose 24,000-plus signatories include leading figures in the evangelical Christian churches of America such as John MacArthur, Russell Moore, John Piper, James Dobson, Wayne Grudem, D.A. Carson, R.C. Sproul, Kevin DeYoung, and more. John Piper, the chancellor of the Bethlehem College & Seminary and founder of Bethlehem

15

Baptist Church in Minneapolis and Desiring God, has also expressed similar views about the roles of men and women in society, human sexuality, and same-sex relationships. Compl. ¶¶ 76–78.

Defendants simply appear to disagree with these views, which are consistent with Schmitt's. They expressly shut down the Quest program because it teaches that men and women have complementarian roles in family and society, that men occupy a particular role in family and society, and that same-sex attraction does not require men or women to engage in same-sex relationships. Schmitt Decl. ¶ 47, Ex. B at 3. In other words, Defendants shut down Quest and Schmitt because they disagree with and intentionally discriminate against traditional, Bible-based, orthodox Christian religious beliefs. Compl. ¶¶ 79–80; Schmitt Decl. ¶¶ 56–59. Defendants thus targeted Schmitt because of his religious beliefs. Compl. ¶ 81–82; Schmitt Decl. ¶¶ 59–60.

## VI.  Defendants are responsible for their actions in shutting down Quest and setting DOC policy.

As evidenced by Defendant Rebertus' letter, Defendants are responsible for the policies of the Department of Corrections enforced against Schmitt and Quest, including the "diversity, equity, and inclusion" policy mentioned by Defendant Rebertus in her July 10, 2023 email to Schmitt. As Commissioner of the DOC, Defendant Schnell has "control and supervision of" the DOC. Minn.

Stat. § 241.01, subd. 1. He is likewise responsible for "administer[ing], maintain[ing], and inspect[ing] all state correctional facilities." *Id.* subd. 3a(d). The MCF is under Schnell's "control and management." *Id.* § 243.75. While Schnell can "delegate to [employees] any of the commissioner's powers, duties and responsibilities," all employees maintaining and administering prisons within the DOC are "subject to the commissioner's control and the conditions the commissioner prescribes." *Id.* §241.01, subd. 3a(h). The legislature has expressly forbidden the commissioner from interfering with the religious exercise of the inmates. *Id.* § 241.05. And the legislature has expressly required "spiritual and faith-based programming" for inmates. *Id.* § 244.03, subd. 1(a)(5).

## VII.  Defendants' actions irreparably harm Schmitt and the inmates Schmitt wishes to serve.

Defendants' actions have harmed Schmitt in two ways, both of which violate his First Amendment rights and thus constitute irreparable harm. First, because Schmitt can no longer facilitate Quest in MCF absent an injunction from this Court. And second, Defendants' actions have caused harm to Schmitt's dignity by violating his constitutional rights and thus treating him as a lesser member of society than others with different viewpoints. Additionally, Defendants' actions harm those inmates who would, if they had

the opportunity, attend and even facilitate the Quest program alongside Schmitt. Compl. ¶¶ 84–86; Schmitt Decl. ¶¶ 64–66.

## ARGUMENT

Under the *Dataphase* test from *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc), to obtain a preliminary injunction under Federal Rule of Civil Procedure 65, "[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## I.   Plaintiff is likely to prevail on the merits of his Free Exercise claim because Defendants cannot show that their actions cancelling Quest satisfy strict scrutiny.

When deciding "whether to grant an injunction in a case involving allegations of First Amendment harm, the *Dataphase* factors collapse into a single inquiry: 'the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue.'" *Brooks v. Roy*, 881 F. Supp. 2d 1034, 1039 (D. Minn. 2012) (quoting *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc)). Plaintiff's Complaint supports this "most significant" factor, *Carson v. Simon*, 978 F.3d 1051, 1059

(8th Cir. 2020), because he has more than "at least a 'fair chance of prevailing'" on the merits of his Free Exercise and Free Speech claims, *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022).[3]

The government Defendants bear the burden of satisfying the strict-scrutiny test to avoid issuance of a preliminary injunction. As the Supreme Court has stated, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, where the "Government bears the burden of proof on the ultimate question of [the challenged action's] constitutionality, [the plaintiff] must be deemed likely to prevail unless the Government has shown that [the plaintiff's] proposed less restrictive alternatives are less effective than [the Defendants' action]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *accord Gonzales*, 546 U.S. at 429.

Therefore, the Defendants bear the burden of showing that Plaintiff's proposed less restrictive alternative—continuing to allow the Quest program to be offered voluntarily at MCF—is less effective than cancelling the program, which Defendants must justify as narrowly tailored to achieve "interests of the highest order." *Fulton*, 141 S. Ct. at 1881 (quoting *Church of the Lukumi*

---

[3] To be clear, the "fair chance of prevailing" standard does not mean "more likely than not"; rather, it is much more lenient, and Plaintiff amply satisfies it. *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016–17 (8th Cir. 2022).

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). The government cannot meet this burden because their "diversity, equity, and inclusion" policy is neither neutral nor generally applicable and cannot survive strict scrutiny. In addition, it discriminates against Plaintiff based on the content of his speech and compels him to say and believe something different to continue ministering to prisoners at MCF.

### A. Free Exercise.

First, "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 884 (1990)). In *Fulton*, the City of Philadelphia had referred prospective foster parents to Catholic Social Services ("CSS") for years. *Id.* at 1874–75. "The religious views of CSS inform[ed] its work in this system." *Id.* at 1875. In addition to "serv[ing] the needy children of Philadelphia," CSS also believes that "marriage is a sacred bond between a man and a woman," and, as a result, would not certify unmarried or same-sex couples as foster parents. *Id.* at 1874–75. The City got word of this restriction and the City Council called for an investigation because "the City had 'laws in place to protect its people from discrimination that occurs under the guise of religious freedom.'" *Id.* at 1875. Suddenly, the City refused

20

to refer any future foster parents to CSS unless the agency agreed to change its policy, in violation of CSS's religious beliefs. *Id.*

The Supreme Court unanimously held that the City's refusal to refer foster parents to CSS violated the First Amendment. Philadelphia's actions were not "generally applicable" because the City had a system of individualized exemptions, where government actors had the "sole discretion" to reject or grant a referral to CSS, based on CSS' religious beliefs. *Id.* at 1878–79.

Moreover, "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.*; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) ("[A] law targeting religious beliefs is never permissible." (quoting *Lukumi*, 508 U.S. at 533)). Defendants' "diversity, equity, and inclusion" policy may sound innocuous, but "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Lukumi*, 508 U.S. at 534.

In *Trinity Lutheran*, the Missouri Department of Natural Resources disqualified religious organizations from receiving grants for rubber playground surfaces made from plastic tires. 582 U.S. at 453–54. As the Supreme Court explained, that policy "expressly discriminate[d] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 462. The State did not

"criminalize[]" the church's religious beliefs, but that did not matter: the State could not require the church "to renounce its religious character in order to participate in an otherwise generally available public benefit program, from which it is fully qualified." *Id.* at 463–66.

Similarly, in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2415 (2022), a high school football coach lost his job "because he knelt at midfield after games to offer a quiet prayer of thanks." Although the school district later admitted that it "could not allow 'an employee, while still on duty, to engage in *religious* conduct,'" it originally declined to renew his contract for a failure "to supervise studentathletes [sic] after games" when he was praying. *Id.* at 2423 (emphasis original). The Supreme Court held that "the District's challenged policies were neither neutral nor applicable." *Id.* at 2422. Because "[p]rohibiting a religious practice was thus the District's unquestioned 'object,'" its policies were not neutral toward religion. *Id.* at 2423. And the policy was not generally applicable because the district "permitted other members of the coaching staff to forgo supervising students briefly after the games" for non-religious reasons so any "sort of postgame supervisory requirement was not applied in an evenhanded, across-the-board way." *Id.*

Here, even though Schmitt is obviously qualified to lead a program at MCF—he did so successfully for over a decade—he is now suddenly prohibited from doing so. The only possible reason for this sudden change is Defendants'

disagreement with his traditional, orthodox Christian views. *See Lukumi*, 508 U.S. at 532 ("At minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminations against some or all religious beliefs or prohibits conduct because it is undertaken for religious reasons.").

Defendants' actions and words demonstrate that the policy they applied to cancel Quest was neither neutral nor generally applicable. Instead, they targeted and cancelled Quest because of the religious beliefs Schmitt and Quest teach. This case could not be more clear cut: Defendants' hostility toward Schmitt's religious beliefs is apparent on the face of Defendant Rebertus' letter identifying why Defendants were cancelling Quest. *See* Compl. ¶ 6; Schmitt Decl. ¶ 47, Ex. B at 3. That letter stated that "[t]he [Quest] program directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, *through a biblical lens* of what a 'real man looks like.'" Schmitt Decl. ¶ 47, Ex. B at 3 (emphasis added). Further, the email characterized Quest's Bible-centered Christian approach as "teach[ing] participants about manhood through a lens of discrimination, exclusivity, gender biases and stereotypes that not only contradict the DOC's mission of providing transformational programming, but can be hurtful to participants, their families, and victims." *Id*. "Prohibiting a religious practice was thus the [MCF's] unquestioned 'object.'" *Kennedy*, 142 S. Ct. at 2423.

Moreover, under Minn. Stat. § 244.03, subd. 1(5), Defendant Schnell, as Commissioner of MCF, must "develop, implement, and provide, as appropriate: . . . (5) spiritual and faith-based programming." He must, but has failed to, administer such programming in a neutral manner. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) ("[T]he government . . . cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." (quoting *Lukumi*, 508 U.S. at 534 (1993)).

It is clear from the roster of events at MCF that other religious beliefs are welcome at MCF, just not Quest's and Schmitt's. Other religious programs such as "Asatru . . .the old Norse paganism," "Catholic Mass," "Jumuah Prayer" for the Islamic faith, and "Rock of Ages" a worship service for Seventh Day Adventists, were able to operate at MCF immediately after Quest was cancelled. Dornbush Decl. ¶ 17, Ex. A. at 1. Allowing some religious groups to stay while targeting and cancelling the Quest program because of its and Plaintiff's religious beliefs demonstrates that Defendants engaged in an individualized assessment of religious beliefs before deciding which beliefs complied with MCF's "diversity, equity, and inclusion" policy, which were entitled to an exception, and, in the end, which were worthy of being offered at MCF. *See Fulton*, 141 S. Ct. at 1878 (holding that the government "may not

refuse to extend that [exemption] system to cases of religious hardship without compelling reason" (quoting *Smith*, 494 U.S. at 884 (alteration original) (internal quotation marks omitted))).

Therefore, the Defendants actions are "examined under the strictest scrutiny" and "can survive such scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Id*. at 1881 (quoting *Lukumi*, 508 U. S. at 546); *see also id.* at 1883 (Barrett, J., concurring) ("A law burdening religious exercise must satisfy strict scrutiny if it gives government officials discretion to grant individualized exemptions."). "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Id*. at 1881 (majority opinion).

The Defendants cannot meet this burden because they have no compelling interest in cancelling Quest, where inmate participation in the Quest program is, has been, and always will be entirely voluntary. *See* Compl. ¶¶ 3, 43; Schmitt Decl. ¶ 21; *see also United States v. Playboy Entm't Grp.*, 529 U.S. 803, 822–23 (2000) (holding that a regulatory regime that allows consumers to voluntarily opt-out of sexually explicit programming is less restrictive than a complete ban on such programming during certain time periods). Further, there cannot be a compelling government interest in inmates voluntarily hearing what Plaintiff has to say—pure paternalism is not a valid interest.

Moreover, Defendants' actions fail narrow tailoring: Schmitt was already voluntarily skipping through the *only* part of the Quest program the State's Recidivism Project Supervisor found objectionable. Compl. ¶¶ 58–62; Schmitt Decl. ¶¶ 39–41, Ex. A at 3. There are therefore less restrictive means of addressing any interest Defendants might claim: the program is voluntary; nobody has to attend it who might be offended, and Defendants made no effort to even offer to allow Schmitt to excise some portions of the Quest program, which he demonstrated he was willing to do where his religious beliefs were not implicated.

## B. Free Speech.

Likewise, Defendants' actions violate Schmitt's free-speech rights by both discriminating against his viewpoint and attempting to force him to 'toe the company line' for the DOC. Laws which "target speech based on its communicative content . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Likewise, in a limited public forum, which Defendants created here by allowing numerous different programs to interact with inmates at MCF, "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995); *see also InterVarsity Christian*

*Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855 (8th Cir. 2021) (a university cancelling InterVarsity Christian Fellowship because of its religious beliefs was viewpoint discrimination). The government also cannot force Schmitt or anyone else to say particular things in order to maintain access to a limited public forum. *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018) (explaining that, with compelled speech, individuals are "coerced into betraying their convictions").

On its face, Defendants' shutting down of Schmitt and Quest expressly targets Schmitt's viewpoint. After all, Rebertus expressly stated that Schmitt's "*biblical lens*"—his viewpoint itself—was the offending thing to Defendants. Criticism of the "lens" through which a person views an issue might as well be the dictionary definition of viewpoint discrimination. Defendants are thus also seeking to compel Schmitt to make affirmative statements that contradict his religious beliefs and to remain silent as to other beliefs. As noted above, there is no compelling interest that could possibly justify this type of discrimination, and cancellation of a program is certainly not the least restrictive means to address issues with its content.[4]

There is also no government interest in paternalism:

---

[4] Plaintiff does not concede that any particular content change is automatically a less-restrictive means of achieving the government interest at issue here; whether Plaintiff would be open to a content change depends on what Defendants might propose and may or may not continue to violate his rights.

> There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them.

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976). Allowing multiple alternatives to the Quest program, which is about as close to "counterspeech" as one gets here, is a less restrictive means of achieving any interest the government seems to claim in preventing "bad" ideas from being heard by inmates.

*       *       *       *

The Defendants cannot meet their burden on any of these claims, so Plaintiff is likely to prevail, or at least has a fair chance of prevailing on the merits of one or more of his claims. *Brant v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022) ("The plaintiff[] need only establish a likelihood of succeeding on the merits of any one of [his] claims." (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps. Of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016))). Plaintiff therefore requests the Court to reinstate the Quest program—to return the parties to the status quo before Defendants' illegal actions—until this lawsuit is decided on the merits.

## II.     Absent a preliminary injunction, Plaintiff will be irreparably harmed because Defendants' actions infringe his Free Exercise.

As a Christian, Schmitt believes that men and women were created by God with unique differences, that recognition of these differences is critically important for a healthy marital relationship, and that teaching these differences and the value of a personal relationship with God through Jesus Christ is vital to successfully rehabilitating those imprisoned for crimes committed so that they can live physically, spiritually, emotionally, and mentally healthy lives through the healing power of Christ. Compl. ¶¶ 25–33; Schmitt Decl. ¶¶ 2–10. The Quest program likewise teaches the long-established, orthodox Christian principle, based in the Bible, that men and women have distinct, complementary roles of equal value to God, themselves, and society. Compl. ¶¶ 35, 37, 40; Schmitt Decl. ¶¶ 12–14, 18.

Furthermore, Plaintiff believes that he has a calling to minister to men in prison. Compl. ¶ 31; Schmitt Decl. ¶¶ 8, 11. Therefore, Schmitt exercised his religious beliefs and right to free speech when he taught the Quest program to inmates who voluntarily choose to participate in the program.

He can no longer do so.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U. S. 347, 373

(1976) (plurality opinion)). As such, Plaintiff has established that he will suffer irreparable injury absent a preliminary injunction prohibiting Defendants from cancelling the Quest program.

### III. The balance of equities and the public interest both favor Plaintiff.

"[W]hen the federal government or agency is the defendant, the final two factors can 'merge' into one." *Noem v. Haaland*, 542 F. Supp. 3d 898, 925 (D.S.D. 2021) (quoting *Flandreau Santee Sioux Tribe v. U.S. Dep't of Agric.*, 2019 U.S. Dist. LEXIS 95188, at *5 (D.S.D. June 6, 2019)).

And, "[w]hen, as here, a plaintiff raises a legitimate constitutional question, the balance of hardships tips sharply in the plaintiff's favor." *Goyette v. City of Minneapolis*, 338 F.R.D. 109, 120 (D. Minn. 2021). Plaintiff's constitutional right to freely exercise his religion is at stake in this case. And "it is always in the public interest to protect constitutional rights." *Carson*, 978 F.3d at 1061.

As demonstrated above, Plaintiff will be irreparably harmed if Defendants are allowed to continue their ban of the Quest program. On the other hand, Defendants suffer no harm by allowing a an entirely voluntary program to continue, *as it has for over a decade*, where they cannot demonstrate a compelling interest to justify their actions.

In sum, "the balance of equities so favors [Plaintiff] that justice requires the court to intervene to preserve the status quo until the merits are determined."

*Dataphase*, 640 F.2d at 113. Plaintiff therefore requests the Court to enjoin the Defendants from cancelling the Quest program until this lawsuit is decided on the merits.

## IV.    The Court should waive any bond requirement for Plaintiff.

Under Rule 65, when issuing a preliminary injunction, the Court has discretion to waive a bond requirement "where damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043. And "[c]ourts have concluded that a bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment." *Goyette*, 338 F.R.D. at 121. Where plaintiff brings a First Amendment Free Exercise challenge and there are no financial costs associated with enjoining the cancellation of a voluntary, Christian-based program, as is the case here, the Court should waive the bond requirement under Rule 65 and issue the injunction.

### CONCLUSION

Plaintiff respectfully request that the Court issue an injunction returning the parties to the status quo before Defendants' unconstitutional actions, allowing the Quest program to resume at MCF while this case proceeds.

**UPPER MIDWEST LAW CENTER**

Dated:  March 8, 2024

*/s/ Alexandra K. Howell*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
Alexandra K. Howell (#504850)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
Doug.Seaton@umlc.org
James.Dickey@umlc.org
(612) 428-7000

**TRUE NORTH LEGAL**

Renee K. Carlson (#389675)
525 Park Street, Suite 460
St. Paul, Minnesota 55103
rcarlson@truenorthlegalmn.org
(612) 789-8811

*Attorneys for Plaintiff*