UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Anthony Schmitt,

        Plaintiff,

    vs.

Jolene Rebertus, in her official
capacity as Assistant Commissioner of
the Minnesota Department of
Corrections; Paul Schnell, in his
official capacity as Commissioner of
the Minnesota Department of
Corrections,

        Defendants.

Civil File No. 24-cv-0034 (JRT/LIB)

**DEFENDANTS' MEMORANDUM
OPPOSING MOTION FOR
PRELIMINARY INJUNCTION**

Plaintiff Anthony Schmitt, a St. Cloud, Minnesota community member, filed this action alleging that the Minnesota Department of Corrections (DOC) Commissioner Paul Schnell and Assistant Commissioner Jolene Rebertus violated his First Amendment rights when the DOC stopped offering a program, the Quest for Authentic Manhood (Quest), he facilitated as a volunteer at the Minnesota Correctional Facility-St. Cloud (MCF-SCL). (Doc. 1.) Schmitt now moves for a preliminary injunction asking this Court to require the DOC to reverse its programming decision and once again offer Quest to its incarcerated population. (Docs. 13-15.) The Court should deny Schmitt's motion because he has not established a factual or legal basis for a preliminary injunction.

## BACKGROUND

Part of the DOC's mission is to reduce incarcerated persons' likelihood of recidivism. (Rebertus Decl. ¶ 3, Ex. 1.) The DOC aims to accomplish this mission by promoting change through proven strategies while providing a safe and secure environment. (*Id.*) Along with its mission, the DOC has identified values, including supporting a safety-conscious environment for staff and incarcerated persons and providing programs and interventions based on evidence-based principles. (*Id.*) Additionally, the DOC's operational goals include providing effective correctional services, holding incarcerated persons accountable, changing incarcerated persons' behavior, and promoting workplace safety for DOC staff. (*Id.*)

### *DOC Facility Programming*

One of the important ways the DOC fulfills its mission, values, and goals is through its facility programming. (*Id.* ¶ 4, Ex. 2.) A DOC program is defined as "a plan of things done in order to achieve a specific result; a facilitated curriculum that is consistently delivered on a regular basis, has a targeted population, addresses a risk and a need, has measured outcomes, has specific admission and discharge criteria, and is evidence based." DOC Policy 204.005. Evidenced based programs are "programs that have been researched and are proven to be effective at reducing recidivism." *Id.* Any newly proposed facility programs are reviewed by the DOC's effective interventions committee and approved or denied by the facility's warden or designee. (Rebertus Decl. ¶ 4, Ex. 2.)

***Community and Volunteer-Led Programming***

In addition to facility programming, the DOC allows some volunteers from the community to enter DOC facilities and lead programs when those programs enhance and expand the services and programs already existing for incarcerated persons. (*Id.* ¶ 5, Ex. 3.) Prospective volunteers must apply and be approved by the DOC before they are permitted to lead a program in DOC facilities. (*Id.*) The DOC has discretion to approve or deny a prospective volunteer and a prospective program. (*Id.*) The DOC decides whether to approve an applicant based on a number of considerations, including whether the prospective volunteer meets all required qualifications and passes all required background checks, whether the proposed program is consistent with the DOC's overall goals and policies, and whether the proposed program raises any safety or security concerns for the prison, its incarcerated population, or its staff. (*Id.*) Once an applicant is approved to lead a program, the DOC retains discretion to periodically review the program. (*Id.*) If the DOC determines that a program is inconsistent with its policies and goals, or if it presents a risk to the safety and security of the prison, the DOC can discontinue the program. (*Id.*) Each year, approved volunteers must be recertified. (*Id.*) The recertification procedure is the same as the original application process, including review of all relevant DOC policies and procedures. (*Id.*) DOC facilities may suspend or terminate a volunteer for violating DOC policies. (*Id.*)

When a community member or organization wants to propose programming, they complete an online DOC Program Proposal Application, available on the DOC's website.[1] (*Id.* ¶ 6, Ex. 4.) The current application notifies applicants that the DOC is currently reviewing program proposals for alignment with evidence-based correctional practices and that the DOC will prioritize proposals that are evidence-based and that fill any gaps in current DOC programming. (*Id.*) Because the DOC receives more program proposals than it can accommodate, it prioritizes programs that support its mission to reduce recidivism and that promote its values of supporting a safety-conscious environment while providing evidence-based interventions. (*Id.*)

### The DOC's Decision to Discontinue the Quest Program

Schmitt began facilitating the Quest program at MCF-SCL in 2012, before the DOC implemented its current process for reviewing community program proposals. (*Id.* ¶ 7.) In 2023, Schmitt inquired about expanding Quest to other DOC facilities, which prompted the DOC's Associate Director of Case Management and Programming, Bridget Letnes, to review the Quest program materials, including the program's workbook, using the DOC's current programming standards. (*Id.*) Schmitt also allowed Letnes to borrow his copy of the Quest DVD library, which incarcerated individuals viewed as part of the Quest curriculum. (*Id.*) After reviewing the Quest workbook and watching the DVD course, Letnes reported to the DOC's Assistant Commissioner for Health, Recovery, and Programming, Jolene Rebertus, that Quest did not align with evidence-based correctional

---

[1] The link to the DOC Program Proposal Application is available at: *https://mn.gov/doc/staff-partners/doing-business-doc/.* (last visited on March 27, 2024)

4

practices and conflicted with the DOC's mission and values. (*Id.*) Rebertus reviewed the information reported by Letnes and agreed with her concerns about the program. (*Id.*) In July 2023, Rebertus informed Schmitt that the DOC would no longer offer Quest as a program for its incarcerated population. (*Id.*)

The DOC's concerns with offering Quest in its facilities fell into two broad categories. (*Id.* ¶ 8.) The first is how the program content interacts with the DOC's sex offense and domestic violence programming. (*Id.*) The second is how the program content implicates the DOC's prohibition on harassment and discrimination in its facilities and the potential impact on security and safety. (*Id.*) In its depiction of "authentic manhood" Quest teaches that a "real" man is not weak, feminine, or passive, and that homosexuality and "the feminized man" are the result of an absent father in the home. (*Id.*) It proposes that there is no credible evidence that homosexuality is biological, that there is a radical gay agenda, and that it is a myth that homosexuals cannot "change." (*Id.*) The program teaches that manhood can only be achieved through heterosexual relationships. (*Id.*) Quest also teaches that an "ignorant" or "needy" mother may cause a man to engage with pornography or turn to violence, crime, alcoholism, abuse, and rape. (*Id.*) Additionally, the program depicts women as fragile and subservient to men. (*Id.*) These stereotypes being taught in a correctional setting are problematic for many reasons and include the following. (*Id.*)

First, Quest's depictions of women—particularly mothers—as the *reason* men commit crimes is not useful or valuable for incarcerated persons who are expected to enroll in DOC's sex offense or domestic violence programming. (*Id.* ¶ 9.) And as an intake

5

facility, MCF-SCL is the first stop for the majority of adult men sentenced to incarceration in a DOC facility. (*Id.*) Most are transferred to another DOC facility based on a variety of factors including rehabilitative programming needs. (*Id.*)

Next, the DOC also has a diverse incarcerated population and workforce that includes female and LGBTQ+ persons. (*Id.* ¶ 10.) The DOC's policy prohibiting harassment and discrimination states clearly that the DOC "does not tolerate any form of discrimination or harassment based on a protected class in its workplaces and programs." (*Id.*, Ex. 6.) And included within the definition of protected class are sex, familial status, marital status, sexual orientation, gender identity, and gender expression. (*Id.*, Ex. 7.) The DOC's harassment and discrimination policy applies "[d]epartment-wide, including all applicants, employees, contractors, student workers, vendors, volunteers, and third parties who have interactions with the [DOC]." (*Id.*, Ex. 6.) Additionally, it is a violation of the DOC's Offender Discipline Rules for any incarcerated person to abuse or harass another person in a facility, whether the other person is an incarcerated person or a member of DOC staff. (*Id.*, Ex. 8.) Examples of abuse or harassment under the discipline rules include "derogatory or profane writing, remarks or gestures; name calling; yelling; and other acts that constitute public expression of disrespect for authority." (*Id.*) Incarcerated persons are also prohibited from engaging in sexual harassment which consists of making "repeated or unwelcome sexual advances; requests for sexual favors; or verbal comments, gestures, or actions of a derogatory or offensive nature to another." (*Id.*)

Quest's content devalues women and LGBTQ+ individuals which is in direct conflict with the DOC's mission, values, and harassment and discrimination polices.

6

(*Id.* ¶ 11.) These teachings also conflict with the DOC's mission and goals of rehabilitation and reducing recidivism rates among its incarcerated population. (*Id.*) Many incarcerated individuals have been convicted of crimes involving domestic abuse or sexual assault, and many have been victims of those crimes themselves. (*Id.*) Quest's teachings that devalue certain individuals based on gender or sexual orientation are harmful and hinder the rehabilitation process for incarcerated individuals. (*Id.*)

The devaluation of women and LGBTQ+ persons also creates safety and security issues in DOC facilities. (*Id.* ¶ 12.) The DOC has many incarcerated persons and staff who do not meet Quest's definition of an "authentic man." (*Id.*) The DOC also has many female staff members, including correctional officers, who interact with incarcerated individuals daily. (*Id.*) Quest's teachings reinforce negative stereotypes about women and LGBTQ+ persons that undermine the authority of women and LGBTQ+ correctional officers. (*Id.*) The safe, secure, and orderly operation of a correctional facility depends on incarcerated persons following facility rules and respecting the authority of facility staff. (*Id.*) Programs like Quest that promote negative beliefs about certain groups of people create more dissidence in the prison, increase confrontations between incarcerated individuals, and increase insubordinate behavior by incarcerated individuals. (*Id.*) These incidents have the potential to turn violent and require interventions by staff, thus presenting a risk to the safety and security of incarcerated individuals and DOC staff alike. (*Id.*)

*Chrisitan Programming Offered at MCF-SCL*

Contrary to Schmitt's allegations, the DOC discontinued Quest because of its content, not because of his religious beliefs. (*Id.* ¶ 13.) According to the Quest website, the program was founded by a man named Robert Lewis. (*Id.*) It is the content taught in *Lewis's program* that is problematic to the DOC.[2] It is not Schmitt's Christian beliefs, but rather the specific teachings included in Quest's program curriculum that prompted the DOC to discontinue offering the program. (*Id.*) In fact, MCF-SCL offers a variety of Christian-based programming and worship opportunities for its incarcerated population. (*Id.*) As an example, the following is the current schedule of Christian programming offered at MCF-SCL:

| DAY | PROGRAM |
| --- | --- |
| Sunday | Prison Fellowship Bible Study |
| Monday | Catholic Mass |
| Tuesday | Rosary Group |
| Thursday | Prison Fellowship Life Skills class |
| Saturday | Minnesota Adventists: Worship, Bible study and "Rock of Ages" |
| 4th Saturday | New Oil Christian Center worship |
| Quarterly | Unity Church Worship |

---

[2] The Authentic Manhood website includes two programs, the "Men's Fraternity" curriculum and another program, "33 The Series." It is the defendants' understanding and belief that the "Quest for Authentic Manhood" program is the same program as the "Men's Fraternity" program. The Authentic Manhood website can be found at: *https://www.authenticmanhood.com*. (last visited on March 27, 2024).

Additionally, the DOC provides spiritual-care throughout its facilities to accommodate the various spiritual and religious affiliations of its incarcerated population. (*Id.*, Ex. 9.)  And although the DOC discontinued the Quest program, it did not suspend or terminate Schmitt from volunteering at its prisons.  (*Id.* ¶ 15.)  Schmitt is free to apply to teach a different program at a DOC prison.  (*Id.*)  He can also correspond with incarcerated individuals by mail, and visit individuals incarcerated at MCF-SCL or any other prison pursuant to the DOC's visiting policy.  (*Id.*)

## ARGUMENT

Preliminary injunctive relief is meant to preserve the status quo and prevent irreparable harm until a court rules on the merits of a lawsuit.  *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 998 (8th Cir. 2023).  Injunctive relief is an extraordinary remedy, and the movant has the burden of demonstrating that he is entitled to an injunction. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021).  And courts are particularly cautious of issuing temporary relief in the correctional context because of the difficulties inherent in prison administration.  *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995).  For the Court to grant Schmitt's motion for a preliminary injunction, Schmitt must demonstrate: (1) a likelihood that he will succeed on the merits in his underlying case; (2) that he will suffer irreparable harm without the injunction; (3) that the balance of harms favors him; and (4) that the public interest favors the injunction. *Dataphase Sys. v. CL Sys.*, 640 F.2d 109, 113 (8th Cir. 1981).  Because Schmitt has not met his burden of establishing that he is entitled to his requested injunctive relief, the Court should deny his motion.

Schmitt asks the Court to order the DOC to reinstate the Quest program pending the final outcome of this lawsuit. This Court should deny his motion because he cannot satisfy any of the *Dataphase* factors. Schmitt is not likely to succeed on the merits of his First Amendment claims because the DOC's decision to discontinue Quest as a programming option for incarcerated persons at MCF-SCL was reasonably related to a legitimate penological interest. Additionally, Schmitt fails to demonstrate that without the injunction he will suffer irreparable harm because he did not make a clear showing that he was deprived of a constitutional right. Moreover, the balance of harms disfavor granting Schmitt's motion because the risk of harm associated with reinstating Quest in DOC facilities, including Quest's direct conflict with the DOC's goals of reducing recidivism and maintaining a safe, secure, and respectful environment for incarcerated persons and DOC staff alike, significantly outweighs any harm allegedly suffered by Schmitt in the absence of injunctive relief. And finally, the public interest also cuts against granting Schmitt's motion because there is a strong public interest in allowing the DOC to exercise its discretion in determining what programs to offer to promote rehabilitation, reduce recidivism, and prohibit harassment and discrimination in its facilities.

## I.   Schmitt is Unlikely to Succeed on the Merits of His Claims.

The first and most important *Dataphase* factor weighs in the defendants' favor because Schmitt is unlikely to succeed on the merits of his First Amendment claims. As a threshold matter, Schmitt does not cite any case law to support his claim that he has a First Amendment right to enter a DOC prison on a regular basis and teach a course to

incarcerated persons.  But even assuming he could establish a First Amendment right, he cannot establish a sufficient likelihood of success on the merits.

First, Schmitt has framed his case improperly and asks the Court to apply the wrong standard.  Schmitt argues, incorrectly, that this Court should apply a strict scrutiny standard, and that the DOC bears the burden to show its actions were narrowly tailored to achieve interests of the highest order.  (*See* Doc. No. 15 at 18-19.)  But the cases Schmitt relies on are inapposite because they do not involve prison administration or a correctional setting.[3]  Schmitt cited only *one* case in his brief that involved a prison.  (*See id.* at 18 (citing *Brooks v. Roy*, 881 F. Supp. 2d 1034, D. Minn. 2012).)  Schmitt ignores the well-established constitutional jurisprudence that applies in correctional settings, and that should control this Court's legal analysis.

---

[3] For example, Schmitt relies heavily on *Fulton v. City of Phila.*, 593 U.S. 522 (2021).  In *Fulton*, a foster care agency would not certify unmarried or same-sex married couples to foster children.  The Court held that by refusing to contract with the agency, the city violated the Free Exercise Clause of the First Amendment.  However, *Fulton* did not involve a prison or any other type of correctional setting.  Thus, the Court did not need to consider the "inordinately difficult undertaking" of prison administration and did not accord deference to prison authorities on issues of prison security.  *See Turner*, 482 U.S. at 85-86.

*Fulton* is also distinguishable because, in that case, the city refused to contract with the agency unless it agreed to do something that conflicted with its religious beliefs: certify same-sex and unmarried couples to foster children.  Here, the DOC is not requiring Schmitt to teach a course, or any specific content, that he does not believe.  Rather, as described in more detail below, the DOC is merely restricting specific content that contradicts its policies and goals, and increases threats to safety, security, and order within its prisons.  For these reasons, *Fulton* is distinguishable and does not apply to this case.

The proper test for the Court to apply in this case is whether the DOC's decision to discontinue offering Quest was rationally related to legitimate penological interests, as set forth in *Thornburgh v. Abbott* and *Turner v. Safley*. 490 U.S. 401 (1989); 482 U.S. 78 (1987). In *Thornburgh*, the court recognized that prison walls do not bar community members like Schmitt from exercising their constitutional rights to communicate with incarcerated persons. 490 U.S. at 407. In fact, the *Thornburgh* Court addressed community-member—or as the court called them "outsider"—interests in communicating with incarcerated persons and noted that "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Id.* With these concerns in mind, the *Thornburgh* Court concluded that restrictions on these types of interactions must be analyzed under the less exacting and more deferential rational-basis standard set forth in *Turner*. *Id.* at 413. Indeed, courts recognize that running a prison is an "inordinately difficult undertaking that requires expertise, planning, and the commitment of resources," and that courts are ill equipped to deal with the problems of prison administration. *Turner*, 482 U.S. at 84-85. Accordingly, courts afford considerable deference to decisions of prison officials who regulate the relations between prisoners and the outside world. *Id.*; *Thornburgh*, 490 U.S. at 407-408.

The four *Turner* factors that courts use to assess the reasonableness of a prison restriction are: (1) whether there is a rational connection between the restriction and the legitimate government interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact an accommodation of the asserted

12

constitutional right will have on prison staff, other incarcerated persons, and prison resources; and (4) whether ready alternatives exist with a de minimis cost. *Turner*, 482 U.S. 78, 89-90. And when analyzing the DOC's decision to discontinue Quest using the *Turner* factors, it is evident that the DOC did not violate Schmitt's First Amendment rights because the discontinuation of Quest is reasonably related to legitimate penological interests.[4]

A. **There is a Rational Connection Between the DOC's Decision to Discontinue Quest and its Legitimate Interest in Reducing Recidivism and Ensuring the Safety and Security of its Facilities.**

The first *Turner* factor is whether there is a rational connection between the DOC discontinuing the Quest program and the legitimate government interest put forward to justify the action. *Turner*, 482 U.S. at 89. The defendants have valid and rational reasons to stop offering Quest at MCF-SCL. The Quest program's depiction of women— particularly mothers—as the *reason* men commit crimes is not useful or valuable for incarcerated persons who are expected to enroll in DOC's sex offense or domestic violence programming. Quest's teachings simply do not align with the DOC's mission and goals of rehabilitation and reducing recidivism rates. Many incarcerated individuals have been convicted of crimes involving domestic abuse or sexual assault, and often they have been victims of those crimes themselves. Quest's teachings that devalue certain individuals based on gender or sexual orientation are harmful and hinder the rehabilitation process.

---

[4] The DOC's decision to discontinue Quest would also satisfy the more stringent strict-scrutiny standard. But because this case involves a prison setting, the more deferential test from *Turner* applies, and defendants will focus their analysis on that test.

Additionally, Quest's negative stereotypes create safety and security issues in DOC facilities.  The safe, secure, and orderly operation of a correctional facility depends on incarcerated persons following facility rules and respecting the authority of facility staff. Programs like Quest that promote negative beliefs about certain groups of people create more dissidence in the prison, increase confrontations between incarcerated individuals, and increase insubordinate behavior by incarcerated individuals.  These incidents have the potential to turn violent and require interventions by staff, thus presenting a risk to the safety and security of incarcerated individuals and DOC staff alike.  Correctional facilities have broad discretion to restrict what takes place in prisons when those restrictions serve a legitimate penological interest.  *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015). Courts, therefore, "recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment." *Murphy v. Mo. Dep't of Corrs.,* 372 F.3d 979, 986 (8th Cir. 2004).

### B.   Schmitt Has Alternative Means to Communicate with Incarcerated Persons.

The second *Turner* factor to consider is whether there are alternative means for Schmitt to exercise the right he claims the DOC is infringing.  *Turner*, 482 U.S. at 90. Here, there are alternative means for Schmitt to communicate with incarcerated persons, and "minister to men in prison" as he calls it (*see* Doc. No. 15 at 29).  He is not prohibited from volunteering at MCF-SCL, and he certainly can propose different programming, including spiritual or religious-based programming, by submitting a Program Proposal Application.  Schmitt could also apply to volunteer to assist with other Christian

14

programming that has already been approved and implemented at MCF-SCL. He can also correspond with incarcerated individuals by mail, and visit individuals incarcerated at MCF-SCL or any other prison pursuant to the DOC's visiting policy.

The question is not whether Schmitt can facilitate the Quest program at MCF-SCL by alternative means. If that were the test it would render this *Turner* factor meaningless. The question is whether Schmitt has alternative means to exercise his alleged First Amendment right to communicate with incarcerated persons in DOC facilities. *See Murchison*, 779 F.3d at 891 (explaining that if the test was whether there was an alternative way to violate the prison regulation, then this *Turner* factor would be meaningless). Again, the DOC rejected the content of the Quest program, not Schmitt as a volunteer based on his religious beliefs. If Schmitt applied to facilitate a different program, the DOC would evaluate whether the program supports its mission to reduce recidivism and whether it promotes its values of supporting a safety-conscious environment while providing evidence-based interventions.

### C. Accommodating Schmitt Would Have a Negative Impact on DOC Facilities.

The next *Turner* factor considers the impact an accommodation of Schmitt's asserted constitutional right would have on DOC facilities. *Turner*, 482 U.S. at 90. The DOC has legitimate concerns about the content of the Quest program, and Schmitt has not proposed an accommodation that does not involve teaching the objectionable content. Thus, it appears there is no likely accommodation that would both allow Schmitt to teach the content and allay the DOC's multiple legitimate concerns. As discussed above, Quest's

content undermines sex offense and domestic violence programming and the overall safety and security of incarcerated persons and DOC staff alike.  When an accommodation of an asserted right could have a significant "ripple effect," courts are particularly deferential to the discretion of corrections officials.  *Murchison*, 779 F.3d at 891.  Because MCF-SCL, as an intake facility, is the first stop for the majority of adult men sentenced to incarceration before transferring to other DOC facilities, there is a significant likelihood that problems associated with Quest's teachings would ripple through multiple DOC facilities.

### D.    There is No De Minimis-Cost Alternative for Keeping the Quest Program Active in DOC Facilities.

The final *Turner* factor to consider is whether a de minimis-cost alternative exists to accommodate Schmitt.  *Turner*, 482 U.S. at 90.  Schmitt put forth no reasonable alternative method, and the defendants cannot conceive of one, for teaching Quest without teaching the objectionable content.  As previously discussed, there are alternative avenues for Schmitt to interact with the incarcerated population at MCF-SCL.  Schmitt insists on teaching Robert Lewis's Quest program yet has not suggested a cost-effective way for the DOC to accommodate his desire to teach Quest without including the objectionable content.  And certainly "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."  *Id.* at 90–91.

### II.    SCHMITT HAS NOT IDENTIFIED ANY THREAT OF IRREPARABLE HARM.

The second TRO factor weighs in the defendants' favor because Schmitt cannot establish that he will suffer irreparable harm without the injunction.  Irreparable harm

requires that a party have no adequate remedy at law.  *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016).  Failure to show irreparable harm is an independent basis to deny a preliminary injunction.  *Id.*  A plaintiff asserting claims under Section 1983 is not entitled to injunctive relief unless he can make a clear showing that he was deprived of a constitutional right.  *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982).

For the reasons described above, Schmitt has not identified any constitutional right to enter a DOC prison and teach a course to incarcerated individuals.  Schmitt claims that he has a "calling to minister to men in prison," but the DOC's decision to discontinue Quest applies specifically to the program and its content.  Schmitt points to a specific sentence in Rebertus's July 10, 2023 letter to him, in which she referred to the program as teaching the study of masculinity "through a biblical lens."  He asserts that this sentence supports his claim that the DOC discriminated against his religious views, but again, the DOC's decision to discontinue the program was not due to the religious nature of the program, and it was not due to any belief Schmitt may personally hold.  The DOC's decision to discontinue Quest was based on its problematic content, the fact that the content may have originated from someone's religious belief was irrelevant to the DOC's determination.

And the DOC has not prohibited Schmitt from visiting or corresponding with incarcerated individuals.  The DOC did not suspend or terminate Schmitt's ability to volunteer with incarcerated individuals at MCF-SCL.  He is free to apply to lead a different course in a DOC prison.  Thus, Schmitt is not prohibited from "ministering to men in

17

prison," he cannot establish any constitutional violation, and he cannot demonstrate irreparable harm.

And finally, even if Schmitt is ultimately successful on the merits of his underlying claim, he would have at most suffered only a temporary inability to enter a DOC prison and teach the Quest program to incarcerated individuals. Any harm suffered by Schmitt would be minimal and temporary and could be remedied by reinstating the program.[5] Schmitt cannot establish any irreparable harm.

## III.   The Balance of Harm Favors Denying Schmitt's Motion.

The balance of harms also weighs heavily against granting injunctive relief. As described above, Schmitt cannot establish any constitutional violation and, therefore, he has not been harmed. But even if he could establish any harm in not being able to teach the Quest program in a DOC prison, that harm is far outweighed by the DOC's substantial concerns regarding the content of the Quest program.

The DOC has significant discretion to approve or deny programs that are offered to incarcerated individuals in its prisons. *See Turner*, 482 U.S. at 84-85 (recognizing that running a prison is an inordinately difficult task that requires expertise, planning, and commitment of resources and that courts therefore accord deference to prison authorities); *see also Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982) (vacating an injunction that interfered with the administration of a prison and would "leave too little discretion in the

---

[5] Any alleged harm to incarcerated individuals who are unable to attend the Quest course is irrelevant in this matter because Schmitt has no standing to raise those claims on behalf of others. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) (recognizing that a plaintiff generally cannot support a claim by asserting the legal rights or interests of a third party).

hands of prison officials who must deal with the very difficult issues of security within their institutions.").

As described above, the DOC reviewed the Quest program and determined that several of the core teachings of the program conflict with the DOC's goals of rehabilitation and reducing rates of recidivism, and its policies against discrimination.  The DOC also determined that the teachings of the program, which devalue and minimize certain groups of people, have a likelihood of increasing confrontations among incarcerated individuals, and between incarcerated individuals and DOC staff.  The DOC thus determined that the program posed a risk to the safety, security, and order of the prison.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349–50 (1987) (describing deference courts afford to prison administrators in anticipating security risks and implementing solutions); *Douglas v. Sigler*, 386 F.2d 684, 688 (8th Cir. 1967) (recognizing that state prisons are under control of executive branch and "courts will not interfere with the conduct, management, and disciplinary control of this type of institution except in extreme cases").  The risk of harm of continuing the program, therefore, significantly outweighs any harm allegedly suffered by Schmitt in the absence of injunctive relief.[6]

---

[6] The fact that Schmitt was permitted to facilitate the Quest program at MCF-SCL before the DOC discontinued it does not alleviate the DOC's concerns about the program's content.  The DOC is continually seeking to improve its processes, and it periodically reevaluates its policies and programs to determine ways to enhance safety and security, and to better effectuate the agency's missions and goals.  The fact that Quest was permitted at the prison in the past does not preclude the DOC from exercising its discretion to discontinue the program in furtherance of those goals.

**IV.    The Public Interest Weighs Against Granting Schmitt's Motion.**

The final factor also weighs in the defendants' favor.  There is a strong public interest in allowing the DOC to exercise its discretion to create and enforce policies that promote rehabilitation, reduce recidivism, and prohibit harassment and discrimination, and to discontinue programs in its prisons that contradict those policies.  There is also a strong public interest in affording the DOC discretion to discontinue programming that presents a risk to the safety, security, and order within DOC prisons.  For all the reasons described above, public interest weighs against injunctive relief.

**CONCLUSION**

For the reasons stated above, the defendants respectfully request that the Court deny Schmitt's motion for a preliminary injunction.

Dated:  March 29, 2024                       Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Corinne Wright_____
CORINNE WRIGHT
Assistant Attorney General
Atty. Reg. No. 0390353
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 757-1198 (Voice)
(651) 297-4139 (Fax)
corinne.wright@ag.state.mn.us

20

BRADLEY D. SIMON
Assistant Attorney General
Atty. Reg. No. 0390363
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1354 (Voice)
(651) 297-4139 (Fax)
bradley.simon@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS
JOLENE REBERTUS AND
PAUL SCHNELL

|#5738207-v1

21