UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ANTHONY SCHMITT,

                Plaintiff,

v.

JOLENE REBERTUS, *in her official capacity as Assistant Commissioner of the Minnesota Department of Corrections*, and PAUL SCHNELL, *in his official capacity as Commissioner of the Minnesota Department of Corrections*,

                Defendants.

Civil No. 24-34 (JRT/LIB)

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Alexandra Howell, **UPPER MIDWEST LAW CENTER**, 8421 Wayzata Boulevard, Suite 300, Golden Valley, MN 55426; Douglas P. Seaton and James V. F. Dickey, **UPPER MIDWEST LAW CENTER**, 12600 Whitewater Drive, Suite 140, Minnetonka, MN 55343; and Renee Carlson, **CARLSON LAW, PLLC**, 855 Village Center Drive, Suite 259, St. Paul, MN 55127, for Plaintiff.

Bradley Simon and Corinne Wright, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1400, St. Paul, MN 55101, for Defendants.

For over a decade, Plaintiff Anthony Schmitt volunteered to teach "The Quest for Authentic Manhood" ("Quest") at the Minnesota Correctional Facility ("MCF") in St. Cloud. Last year, Assistant Commissioner of Health, Recovery & Programming Jolene Rebertus informed Schmitt that he would no longer be allowed to teach Quest. The program, which teaches Schmitt's view of masculinity from a Christian perspective,

violated the MCF's policies by including homophobic content and blaming women for many of the prisoners' hardships. Schmitt alleges that Rebertus's decision to terminate Quest violates his First Amendment Rights to free speech and free exercise of his religion and he asks for a preliminary injunction reinstating the program. The Court will deny Schmitt's motion.

## BACKGROUND

### I. FACTS

Schmitt volunteered to teach Quest at MCF St. Cloud from 2012 to 2023. (Decl. Anthony Schmitt ("Schmitt Decl.") ¶¶ 22, 47, Mar. 8, 2024, Docket No. 16.) Quest instructs participants in Schmitt's view of manhood from a Christian perspective. (*Id.* ¶ 12.) The Quest program relies on a series of 24 videos created by Dr. Robert Lewis, which have been widely shown in churches and prisons across the United States. (*Id*. ¶¶ 13, 16, 19.) The class at MCF St. Cloud is voluntary, and more than a thousand inmates have enrolled over the years. (*Id*. ¶¶ 21, 23.)

A state recidivism expert reviewed the Quest program in 2018. (*Id.* ¶ 39.) Alongside other positive notes, the reviewer instructed Schmitt to skip a portion of the Quest curriculum that taught, consistent with Schmitt's beliefs, that "homosexual acts are sinful, not solely driven by innate sexual orientation, and cause separation between people and God, as all sin does, but can be avoided through repentance." (*Id.* ¶¶ 40–41; Schmitt Decl., Ex. A at 3–4.) In response, Schmitt began skipping that portion of the video. (Schmitt Decl. ¶ 41.)

Last year, Rebertus sent Schmitt an email informing him that he would no longer be permitted to teach Quest because the program "directly conflicts with the diversity, equity, and inclusivity values of the department by defining manhood, or the study of masculinity, through a biblical lens of what a 'real man looks like.'" (Schmitt Decl., Ex. B at 4.) Rebertus cited several concerns with the Quest curriculum. For instance, men and relationships were taught to always be heterosexual, and women and mothers were blamed for many of the hardships in men's lives. (*Id.*) Rebertus believed that the reinforcement of gendered stereotypes and the framing of women as holding back men could create a dangerous and uncomfortable environment for victims of abuse by women and hamper efforts to reform male perpetrators of domestic violence. (*Id*.) Rebertus emphasized the importance of allowing prisoners to "explore their identity with professionals who root practice and teachings safely in trauma informed science and research." (*Id.*) And she clarified that although "[r]eligious services are provided" in the MCF, "just because a program identifies as a religious program does not mean the DOC must provide it." (*Id.*)

Schmitt alleges that the MCF's decision to terminate Quest violates his free speech and free exercise rights under the First Amendment. (*See generally* Compl., Jan. 8, 2024, Docket No. 1.) Schmitt moves for a preliminary injunction reinstating Quest, claiming that he will suffer irreparable harm if he is not able to teach his class. (Pl.'s Mot. for Prelim. Inj., Mar. 28, 2024, Docket No. 13.)

**DISCUSSION**

I.  **STANDARD OF REVIEW**

Courts evaluating a motion for preliminary injunctive relief weigh four factors, commonly referred to in the Eighth Circuit as the *Dataphase* factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  The party seeking injunctive relief bears the burden of proving the *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

When applying these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).  That said, "injunctive relief is an extraordinary remedy." *Watts v. Fed. Home Loan Mortg. Corp.*, No. 12-692, 2012 WL 1901304, at *3 (D. Minn. May 25, 2012).

II. **LIKELIHOOD OF SUCCESS ON THE MERITS**

  A. *TURNER* APPLIES

The merits of this case hinge almost entirely on the level of scrutiny.  Schmitt advocates for strict scrutiny while Rebertus contends that *Turner v. Safley* provides the

appropriate standard of review. *See* 482 U.S. 78 (1987). *Turner* instructs courts to uphold prison regulations that burden constitutional rights so long as they are "reasonably related to legitimate penological interests." *Id*. at 89.

In *Turner*, the Supreme Court reconciled its holdings that prisoners are entitled to constitutional protections with the reality that prison administrators, not courts, are best equipped to run correctional facilities. *Id.* at 84–85. Recognizing that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper" orderly prison administration, the Supreme Court adopted a reasonableness standard. *Id.* at 89. Because this case arises in a penological setting and revolves around decisions of prison administration, *Turner*'s standard, not strict scrutiny, applies.

Schmitt attempts to sidestep *Turner* by claiming that *Turner* only applies to prisoners' constitutional claims, not those of outsiders. Schmitt is wrong. "[T]he identity of the individuals whose rights allegedly have been infringed" is irrelevant. *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989). And "any attempt to forge separate standards for cases implicating the rights of outsiders is out of step" with decisions following *Turner*. *Id.*; *see also Hernandez v. McGinnis*, 272 F. Supp. 2d 223, 226 (W.D.N.Y. 2003) (*Turner* "applies notwithstanding that this case implicates the rights of non-inmates as well as those of a prisoner."). *Turner* was a decision grounded in policy, concerned with the unique difficulties of prison settings. *See* 482 U.S. at 84–85, 89. Worries about judicial

capacity are equally present when a non-inmate levies a constitutional challenge whose remedy would be effectuated behind prison walls. Where prison officials believe that Schmitt's teachings will undermine their rehabilitative missions, those institutional concerns are no less implicated because Schmitt is an outsider than if he were an inmate.

Schmitt also argues that his asserted First Amendment interests are not "inconsistent with proper incarceration" and *Johnson v. California* thus mandates application of strict scrutiny. *See* 543 U.S. 499, 510 (2005) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003)). *Johnson* extricates certain constitutional challenges—namely, race-based equal protection and Eighth Amendment cruel and unusual punishment actions—from *Turner's* domain. *Id.* at 510–11. But courts consistently apply *Turner* to First Amendment challenges, including in *Turner* itself. 482 U.S. at 93. And as the Court will further explore below, Schmitt's programming is inconsistent with proper incarceration. Thus, the Court will proceed under *Turner*'s standard of review.

### B. *TURNER* FACTORS

Under *Turner*, courts test whether prison regulations are reasonably related to legitimate penological objectives through a four-factor test. 482 U.S. at 89–91. The factors are: (1) whether a rational connection exists between the policy[1] and the prison's legitimate interest; (2) whether there are alternate means of exercising the restricted

---

[1] Although *Turner* speaks of policies, the standard applies equally to individualized determinations—here, the decision to terminate the Quest class. *See Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004).

right; (3) the impact that accommodating the asserted constitutional right would have on prisoners, staff, and the institution's resources; and (4) whether alternative means of achieving the goal at little cost are present. *Id.*; *Overton*, 539 U.S. at 132.

***First***, there is a rational connection between Rebertus's decision to terminate Quest and legitimate penological interests. *See Turner*, 482 U.S. at 89.

Rebertus alleges that her decision to terminate Schmitt's Quest class advances two penological interests. First, Quest hampers the correctional facility's mission to rehabilitate incarcerated individuals and reduce recidivism. Devaluing individuals based on gender and sexual orientation and blaming women for crimes committed by men stunts the facility's rehabilitative mission—particularly for those prisoners convicted of, or who have been victims of, crimes involving domestic abuse or sexual assault. Second, Quest's teachings threaten safety and security inside the facility. Quest's messages encourage insubordination towards female guards and staff members and devalue LGBTQ+ employees and inmates.

However, in Rebertus's letter terminating the Quest program, she raised only the rehabilitation concerns; she said nothing of security. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (cleaned up). Thus, on the present record, the Court will credit only the former, rehabilitative interest.

The rehabilitative interest is sufficient standing alone.  Rehabilitation and reducing recidivism are legitimate penological interests.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974), *overruled on other grounds by Thornburgh*, 490 U.S. at 413–14 ("An important function of the corrections system is the deterrence of crime.").  Rebertus reached a rational conclusion that the gender-based stereotypes Schmitt taught in Quest undermined accountability and rehabilitation, particularly for those inmates whose crimes or backgrounds involved gender-based violence.  The Court's perception of rationality is reinforced by the deference courts afford to the expertise of prison officials.  *See Murphy v. Mo. Dep't of Corrs.*, 372 F.3d 979, 986 (8th Cir. 2004).

Schmitt counters that, as a matter of law, there is no legitimate interest in discriminating on the basis of religion.  That is true.  *See Emad v. Dodge Cnty.*, 71 F.4th 649, 653 (7th Cir. 2023).  But Rebertus's reference to Schmitt's "biblical lens" is descriptive, not discriminatory.  Indeed, it is a description that Schmitt himself uses to describe his teachings.  (*See* Schmitt Decl. ¶ 12.)  Reading Rebertus's entire explanation, she did not terminate Quest because of its religious nature.  Rather, she terminated Quest because it teaches "discrimination, exclusivity, gender biases, and stereotypes" that directly conflict with the prison's rehabilitative mission.  (Schmitt Decl. Ex. B at 4.)  This is not, as Schmitt put the point, a case of "John Calvin is out and Augustine of Hippo is in."  (Pl.'s Reply at 9, Apr. 12, 2024, Docket No. 24.)  Instead, this is a case of "stereotypes are out and evidence-based programming is in."  Thus, though the programming was religious, Rebertus's

-8-

termination decision was "'neutral' in the technical sense in which [the Supreme Court] meant and used that term in *Turner*." *Thornburgh*, 490 U.S. at 415–16.

**Second**, there are alternative means for Schmitt to exercise his allegedly infringed rights. *See Turner*, 482 U.S. at 90. He can volunteer again so long as he adopts a curriculum that comports with the facility's programming requirements. And even if he does not, he can continue to instruct inmates in the Quest curriculum through individual visits and written correspondence. Of course, neither of those options give Schmitt exactly what he wants: to teach the Quest curriculum to larger groups. But the alternative means do not have to replicate the requested accommodation. *See Overton*, 539 U.S. at 135 ("Alternatives . . . need not be ideal, however; they need only be available."). For example, in *Firewalker-Fields v. Lee*, the Fourth Circuit held that access to an imam for solitary Friday prayers sufficed, even where the inmate preferred communal prayer. 58 F.4th 104, 117 (4th Cir. 2023). So too, here. Although Schmitt would prefer to teach in a group setting, his ability to do so individually through the normal visitation process is an alternative means for him to exercise his faith.

**Third**, accommodating Schmitt's preferences would burden the facility. *See Turner*, 482 U.S. at 90. As *Turner* described,

> In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant 'ripple effect' on fellow

-9-

> inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.

*Id.* Schmitt's teachings may harm those inmates who committed or were victims of acts of gender-based violence. Accommodations would thus reverberate beyond Schmitt.

In general, it is difficult to see a clear limiting principal to Schmitt's position. It cannot be that prisons are constitutionally obligated to accept all comers who wish to offer religious programming no matter its message. That would be administratively burdensome, and depending on the content of any given offering, downright dangerous.

**Fourth**, Schmitt has not proposed a *de minimis* cost alternative. *See Turner*, 482 U.S. at 90. *Turner* places the burden on the petitioner to propose alternatives, and Schmitt never did so. *See id.* at 90–91.

*     *     *

In sum, all four *Turner* factors weigh against Schmitt. He thus has not shown a likelihood of success on the merits.

## II.     THREAT OF IRREPARABLE HARM

Schmitt observes that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). That proposition presumes a First Amendment violation which, on this record, Schmitt has not established. Thus, Schmitt fails to show irreparable harm.

### III. BALANCE OF HARMS AND PUBLIC INTEREST

The balance of harms and public interest merge when the government opposes injunctive relief. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). As discussed above, there is a strong public interest in allowing prison administrators discretion over inmate rehabilitation and the operation of their facilities. Where Rebertus has determined that the Quest program is inappropriate for the prison environment and detrimental to the rehabilitative mission, the balance of harms and public interest favor Rebertus.

Schmitt contends that Rebertus's claimed harm is belied by the fact that Schmitt taught Quest without incident for over a decade. But that record speaks only to the in-prison security concerns that the Court did not credit. It has no bearing on Rebertus's assessment of the rehabilitative value of Quest. Nor would it be appropriate for the Court to make the MCF wait for something to go wrong before allowing it to change its policies.

Additionally, Rebertus was appointed as the Assistant Commissioner of Health, Recovery and Programming on June 20, 2023, less than a month before she terminated the Quest program. *See* Minn. Dep't Corrs., *DOC Executive Leadership Team*, https://mn.gov/doc/about/agency-background-history/organization/ (last accessed Aug. 5, 2024). That her predecessor allowed the programming does not mean that she should be bound by prior decisions, unable to institute reforms in the areas she was appointed to oversee.

## CONCLUSION

Because the *Dataphase* factors favor Rebertus, the Court will deny Schmitt's Motion for a Preliminary Injunction.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction [Docket No. 13] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 22, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge